## IN THE COURT OF APPEALS OF IOWA

No. 17-2022
Filed October 10, 2018

IN RE THE MARRIAGE OF DAWN RENEE CHRISTENSON
AND CHAD TOTTEN CHRISTENSON

Upon the Petition of
**DAWN RENEE CHRISTENSON,**
        Petitioner-Appellant,

**And Concerning**
**CHAD TOTTEN CHRISTENSON,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Michael D. Huppert,

Judge.


        The petitioner appeals the district court's denial of her application to modify

provisions of the divorce decree, including the provisions regarding legal custody

and physical care of the parties' minor child and the corresponding child-support

obligation. **AFFIRMED.**


        Blake D. Lubinus of Lubinus Law Firm, PLLC, Des Moines, for appellant.

        Cory F. Gourley of Gourley, Rehkemper & Lindholm, PLC, West Des

Moines, for appellee.


        Considered by Potterfield, P.J., and Bower and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

Dawn Christenson appeals from the district court's denial of her petition to modify provisions of the decree dissolving her marriage to Chad Christenson. Dawn asked the district court to modify the decree to give her sole legal custody and physical care of the parties' minor child; she also asked the court to modify the child-support obligation accordingly. On appeal, Dawn challenges the district court's denial of her motion for default judgment. Alternatively, she argues the court should have granted her application for modification on the merits because a substantial change in circumstances warranting modification exists and modification is in the minor child's best interests.

**I. Background Facts and Proceedings.**

Dawn and Chad were married in 1997. They had one child in 1997 and another in 2001 before divorcing in 2006. The dissolution decree provided for the parties to share legal custody of the minor children and for Chad to have the children in his physical care; Dawn was given "reasonable" parenting time with the children.

Dawn filed the application for modification on February 27, 2017. The only child at issue is A.C.—the child born in 2001. Dawn asked the court to modify the decree to give her sole legal custody and physical care of A.C., claiming her and Chad's ability to communicate had broken down to the point it negatively impacted the child. She also alleged that Chad was struggling with substance abuse and, as a result, had picked up a number of criminal charges, including ones for domestic violence against his recent ex-wife and arson.

On March 6, the court filed an order outlining the "family law case requirements," which advised both parties that whether or not they were represented by an attorney, each was required to attend a "children in the middle" course, provide certain financial information, and file a child support guideline worksheet.

On April 20, Dawn filed a notice of intent to file an application for default judgment as Chad had not filed an answer to her application or any of the required documents.

According to the pretrial order, neither Chad nor an attorney for Chad attended the pretrial conference that took place on April 21. Additionally, Chad had not yet filed an affidavit regarding his financial status, a child support guideline worksheet, or a certificate showing he completed the "children in the middle" course. The court ordered Chad to file "the needed documents within fourteen days" or warned that sanctions may be imposed.

On May 9, Dawn filed an application for entry of a default order modifying the dissolution decree as she had requested. Dawn noted Chad, in addition to not filing an answer to the application for modification, had also failed to comply with the court's order to file the documents required for family law cases.

The district court scheduled a hearing on the motion for default for June 7. Chad attended the hearing and told the court he had not yet filed any documents because he "had a real rough time the last few months, and [he was] slowly getting things back together." He advised the court he would like the opportunity to comply with the order. During the hearing, the court indicated it "thinks that the best practice is always to have cases heard on their merits and not by default." The

court gave Chad twenty-one days to file all of the necessary documents with the court and warned that if he failed to do so, the court would then find him in default.

Chad filed an answer to the application for modification on June 23. Shortly thereafter, he filed a motion to show cause, in which he alleged that Dawn was in violation of the original decree. Chad also filed a motion for writ of habeas corpus. Specifically, Chad alleged that Dawn had been caring for their minor child since February 2017 based on a temporary agreement between the parties and that during that time, she had placed A.C. in a mental-health institution without informing Chad. Chad stated he only learned of it after receiving a phone call from A.C. "begging [Chad] to come get him from an institution in Texas." Chad traveled to Texas to get the child but was told by the institution that due to the temporary agreement placing A.C. in Dawn's care, they could not release the child to him. Chad asked Dawn to return A.C. to his care, but Dawn refused.

The court set a hearing on both Chad's application for rule to show cause and his motion for writ of habeas corpus for August 14, 2017, and ordered Dawn to bring A.C. with her to the hearing, which she did. At the hearing, Dawn introduced into evidence the residential treatment center application she had filled out, which included a narrative she provided the center about A.C. She reported to the center her contact had been extremely limited with both children for years, seeing them only "for approximately eight weeks during the summers and sometimes a few days to a week over Christmas vacation, and one or two spring breaks." She explained she had care of A.C. since February 2017 because Chad called her and told her he was unable to care for him at the time. After she took A.C. to live with her in Kansas—where she was then stationed for her job in the

military—she learned Chad had a drinking problem, was in the process of getting divorced, and had recently received a number of criminal charges against him, including charges for operating while intoxicated, domestic abuse, and arson. She also reported to the center that A.C. had been "extremely depressed, lethargic, and angry" since moving in with her; she claimed he was lying to her about how he was doing in school and had recently damaged many items in their home. On one occasion, he barricaded himself in a room, where he made "growly/moan noises and pull[ed] his hair . . . and kick[ed] his legs at the wall"; on another occasion, he had an outburst and began hitting his head on the stair railing and doorjamb. In an August 2017 report from the residential treatment facility, the medical director of the facility provided an update, stating in part:

> Since his admission, [A.C.] has not displayed any aggressive behaviors towards staff or peers at the facility. He is cooperative and respectful to all members of the staff and immediately complies with staff requests. He denies symptoms of depression and becomes upset when anyone claims he is depressed. He has not identified any additional coping skills since his admission due to his continued belief that he does not need to be in residential treatment. . . . In family sessions with his mother, [A.C.] reports no desire to communicate with his mother. He becomes very hostile towards his mother and has a difficult time regulating his emotions.

Chad testified A.C. had not had any mental-health or behavioral issues before moving in with Dawn. He stated his relationship with A.C. had always been good and that he was now in a better place to resume care of him. He testified he had received a deferred judgment for a number of his charges and was currently serving a one-year probation. As part of that probation, he had to attend treatment for his drinking and refrain from drinking alcohol; he had successfully completed the treatment program.

During the hearing, the parties, with the aid of the court, came to an agreement that A.C. would return to Iowa to live with Chad pending the court's determination on the application for modification. In its written order filed after the hearing, the court stated, in part:

> The parties, in consultation with the court, agreed to a plan that would allow A.C. to return to Chad's physical care. First, the parties agreed that A.C. would be taken for an evaluation by a doctor in the Des Moines area. Second, Chad agreed to comply with any recommendations made under that evaluation, whether it be continued inpatient treatment or some form of outpatient treatment. This would allow A.C. the opportunity to return to Chad's care and begin school back in Iowa. Additionally, [the older brother] agreed to return to [living with the father] to assist in monitoring A.C. [The older brother] has a good relationship with A.C. and is regarded by both parents as a reliable person to help ensure a smooth transition.
>
> There were other factors that assisted the court in accepting this agreement. First, A.C. had not shown the same type of behaviors while in Chad's care that he showed while living with Dawn. This may not have anything to do with Dawn, but rather A.C.'s frustration with being moved to a different state and away from his school and friends. Second, Chad has concluded his divorce and resolved his criminal charges by accepting a plea that resulted in one year probation. He has been successful on probation and is no longer consuming alcohol. He has good employment and was living alone in his own residence at the time of the hearing. Third, while A.C. has not been discharged from the Texas facility, he has not had any aggressive behaviors toward peers or staff and the parties are not concerned about acts of self-harm. It is not abundantly clear why continued inpatient treatment is needed after several weeks of treatment, and a follow-up evaluation will help identify A.C.'s current mental health needs. Based on all of these facts, the court believes there to be a high likelihood that implementation of the agreement would benefit A.C.
>
> It will be important for Chad to comply with this order and all recommendations by A.C.'s providers in the Des Moines area. Dawn has filed a modification action that is pending. Any failure to comply may be considered by the court at the time the modification is adjudicated. Chad is required to keep Dawn apprised of A.C.'s condition and treatment. It is clear their communication has not been great in the past, but it will be critical to have good communication in light of A.C.'s diagnoses.

The application for modification was tried to the court on November 1. Dawn testified about her career in the military, including that she had been stationed outside the country a number of times since the parties' divorce; she never lived in the same state as the children after the divorce. At the time of trial, she had just recently been stationed in Texas. Dawn had always considered her relationship with A.C. to be good, even though she did not get to spend much time with him. Their relationship deteriorated, with A.C. growing more hostile and distant, after Chad sent A.C. to live with her in February. Dawn testified having A.C. in her care originally went well, but then he "had a bit of a breakdown, and he started becoming destructive and violent in [her] home." According to Dawn, she then decided to place A.C. in an inpatient treatment facility at the recommendation of a licensed family therapist. Although Dawn was living in Kansas, she placed A.C. in a treatment facility in Texas. At the time Dawn placed A.C. in Texas, she was not aware she would be stationed there soon. The treatment facility diagnosed A.C. with severe recurrent major depressive disorder and oppositional defiance disorder.

During her testimony, Dawn conceded that A.C. was very angry with her and that she understood the anger was not likely to be solved by again removing A.C. from Iowa and requiring him to move to Texas, but she testified she believed it was in his best interests because she could provide a safe, stable home and would make sure he received any mental-health counseling that was necessary.

Chad testified he had taken A.C. to a local hospital to have him evaluated for treatment following the court's August order, but the hospital would not evaluate A.C. because he did not have an emergent situation. The paperwork from the

hospital showed that it referred Chad and A.C. to a local provider to have the evaluation completed, but Chad failed to follow through. Chad admitted during his testimony that he had begun consuming alcohol again at times. He also testified that A.C. was doing well in his care, stating A.C. was doing well in school in Iowa and had not exhibited any signs of depression or aggression.

The older brother also testified; he had moved back into Chad's home following the August 2017 court order returning A.C. to Iowa. He stated that when confronted with the prospect of having to return to Dawn's care, A.C. had "a lot of anger. . . . There's been a little of bit denial but mostly just anger." He believed that A.C.'s anger was generally directed at Dawn. The older brother believed A.C. was doing well in school in Iowa and that the situation in Chad's home had improved since August 2016. When asked about concerns he had, the brother expressed concerns regarding A.C. living with either parent. In regard to Dawn, the brother expressed "concern[] that [A.C.] would become too angry to function again" In regard to Chad, the brother stated, "I know he'd be happier in Iowa, but I don't know that if it's the best place for him" due to "[t]he continued evidence of alcoholism" in Chad's home. The brother indicated he was unsure if he had seen Chad intoxicated since he moved back into the home but noted that he had seen liquor bottles in the home.

After the close of evidence, the court ruled from the bench, stating in part:

> I am fairly well convinced that if [Dawn] were to be awarded physical care in this case, there would be an almost immediate resumption of the animosity and conflict that plagued the household once [A.C.] voluntarily went to live with her in February or March of this year. I am sure that there would be an effort to obtain similar treatment than what would have been similar treatment comparable to what was afforded him when he was living initially in Kansas and

then ultimately in Texas. I don't have a good sense as to the therapeutic value of that treatment.

It's concerning, as I think it was to [the court hearing the motions to show cause and for writ of habeas corpus], that the child was in an inpatient setting for an extended period of time, really receiving, from what I could tell from the limited documentation, very little of anything that would constitute treatment or progress toward some sort of goal.

And then I think it's a fair assessment that the problems that prompted the treatment were not pre-existing but more related to the change in custody and this long-standing animosity between him and his mother, the sources of which I can't begin to delve into because they go far beyond the record in this case. So that's the one side of it. Sending the child to live with his mother, we have an idea as to what that's going to look like because we saw it unfold in the spring of this year.

On the other hand, [Chad], you've not done yourself any favors in this case, I'll be honest with you. [The court], I thought, was fairly clear in what [it] expected of you in the interim while this case was pending. And you just dropped the ball. There's no other way to say it. You had some pretty lame excuses up here. Whatever was going on, it just wasn't going to happen as far as you were concerned. And that's—that's not what I would want to see happen by someone who claims that their continued parenting for a child would be in that child's best interest when the one thing they're asked to do in the course of a court proceeding they don't follow up on.

So bottom line is this is a difficult decision. So what I have to look at is what is the upside of having this young man continue to live with [Chad]. I don't have much in that regard either. I've been told he's doing well in school. I don't have any records of that.

I really don't have much beyond that except for the report of his older brother who has been tasked with a difficult job, a job a sibling, frankly, shouldn't have if the parents were doing their jobs appropriately. But I think it's one he is trying to discharge in good faith. And I found his testimony to be credible in that regard both as concerns, frankly, [Chad], your shortcomings as far as continuing to struggle with alcohol, but more importantly the fact that his brother [A.C.] is doing okay in terms of school, et cetera, and the things that you would expect a 16-year-old to be doing at this time of their life.

So while, [Chad], you've disappointed the Court in terms of your reluctance to follow through with the Court's direction, I am not convinced that the best thing for this child right now is to have him go back to Texas to live with [Dawn]. I am convinced that it would be better for the relatively short duration that remains of his minority, couple years, that he continue to live up here with his father. Hopefully with the continued oversight of his brother, and, [Chad], I hope with little better work out of you, frankly. But at this point I don't

believe that it would be in the child's best interest to change physical care at this late stage.

I can appreciate your concerns, [Dawn], but I think a lot of them are resulting of what occurred once he got in your care and not things that developed prior to that transfer. And I don't want to repeat that again for him. And I am convinced it would occur if that were to happen.

So my ruling is that the petitioner has failed to establish sufficient grounds to modify either the legal custodial arrangement or the physical care arrangements in this decree, and that the requested modification would not be in the child's best interest.

Dawn appeals.[1]

## II. Standard of Review.

"A decision to grant or deny a motion for default judgment rests in the sound discretion of the trial court." *Jack v. P & A Farms, Ltd.*, 822 N.W.2d 511, 515 (Iowa 2012) (citation omitted). We will only reverse the court's decision if its discretion has been abused. *Id.*

We review de novo the proceedings for the modification of child custody. *In re Marriage of Whalen*, 569 N.W.2d 626, 628 (Iowa Ct. App. 1997).

## III. Discussion.

### A. Default Judgment.

Dawn maintains the district court should have granted her application for default judgment. Dawn concedes that the "general policy in this jurisdiction has been to allow trial on the merits." *Whatff v. Iowa Methodist Hosp.*, 219 N.W.2d 18, 21 (Iowa 1974). But she maintains default should have been entered here because Chad failed to establish "good cause" for his late answer and never filed

---

[1] Chad has not filed an appellate brief nor a written statement waiving the brief. *See* Iowa R. App. P. 6.901(1)(b).

the necessary documents for the family law case. She also claims Chad was given special treatment as a pro se litigant.

We agree with Dawn that Chad was in default when she filed her motion for default judgment. However, because it is generally disfavored to take an action that prevents a trial on the merits, and because dismissal and default judgment do just that, "the range of trial court's discretion to impose such sanctions is narrow." *In re Marriage of Williams*, 595 N.W.2d 126, 129 (Iowa 1999) (citation omitted). Additionally, in matters involving custody of children, the district court has the extra burden of ensuring that the action it takes—even when granting a default judgment—is in the best interests of the child at issue. *See Fenton v. Webb*, 705 N.W.2d 323, 326–27 (Iowa Ct. App. 2005) (reversing the district court's entry of a default judgment because the court made a custody determination without evidence to warrant the judgment; "the court should have entertained evidence relating to the best interests of the child" because "[a] child does not lose his or her rights because a parent fails to comply with court rules").

While Dawn has established that default judgment as a sanction may have been appropriate, "in an action for custody, the court's ultimate ruling must be governed by the child's best interests—not a sanction." *Carmichael v. Philpott*, No. 17-0124, 2018 WL 739275, at *3 (Iowa Ct. App. Feb. 7, 2018). Under these circumstances, we cannot say the district court abused its discretion in denying her application for default.

**B. Merits.**

Dawn maintains the district court should have granted her application to modify the physical-care provision of the dissolution decree to place A.C. in her

physical care. To be successful, Dawn has the burden to establish, by a preponderance of the evidence, a substantial change in circumstances justifying her requested modification. *See In re Marriage of Thielges*, 623 N.W.2d 232, 235 (Iowa 2000). She must also prove she can minister more effectively to A.C.'s well-being than Chad is able. *See id.* This is a heavy burden, as we are ultimately guided by the principle "that once custody of [a] child[] has been fixed it should be disturbed only for the most cogent of reasons." *Id.* (citation omitted).

We agree with Dawn that a substantial change in circumstances exists. Several years after the parties' 2006 divorce, Chad developed a drinking problem and incurred a number of criminal charges—some as a direct result of his abuse of alcohol and others more tangentially related. One such incident—which resulted in Chad being charged with arson, a class "B" felony—involved Chad throwing pillows on the top of the stove and lighting them on fire, while A.C. and Chad's recent ex-wife were in the home. While Chad had dealt with the criminal charges—entering guilty pleas to reduced charges and ultimately receiving deferred judgments—he was still on probation at the time of the modification trial and appeared to continue to struggle with alcohol, despite the fact he had successfully completed substance-abuse treatment.

However, we cannot find that Dawn is able to more effectively minister to A.C.'s wellbeing. We acknowledge Chad's failure to follow through with court orders in this case; he failed to file a number of required documents and, even more importantly, failed to follow through with obtaining a psychological evaluation of A.C. We also have concerns Chad is continuing to drink alcohol. However, as the district court did, we note that A.C.'s angry outbursts and issues in school did

not begin until he was sent to live with Dawn. We are not suggesting Dawn is at fault, but it seems A.C.'s struggles were magnified when he was forced to move in with a mother he has seen only sporadically since early childhood[2] and who lives several states away from his friends and older brother—to whom A.C. is especially close. In reaching this decision, we credit the older brother's testimony that A.C.'s issues—as described by Dawn—did not continue after A.C. was returned to Chad's home in Iowa in August 2017. Additionally, A.C. was sixteen and in his junior year of high school at the time of the modification trial; we cannot say uprooting A.C. at this point in his life is in his best interests. While Dawn has established she is prepared to care for and support A.C., in determining which is the better placement for A.C., we have to consider the characteristics of the specific child at issue, "including [his] age, maturity, mental and physical health." *See In re Marriage of Winters*, 223 N.W.2d 165, 166 (Iowa 1974). Having done that here, we agree with the district court that Dawn's request to modify the physical-care arrangement should be denied.[3]

For the same reasons, we decline Dawn's request to grant her sole legal custody of A.C. *See In re Marriage of Morrison*, No. 16-0886, 2017 WL 936152, at *4 (Iowa Ct. App. Mar. 8, 2017) ("To modify an award of joint legal custody to sole custody, the applying party must prove by a preponderance of the evidence that there has been a material and substantial change in circumstances that it

---

[2] Dawn initially filed for dissolution in April 2005, when A.C. was three years old. At the time, Dawn was living in Maryland, where she was stationed for work, and Chad and the children resided in Iowa. Dawn testified at the modification trial that Chad had moved with the children to Iowa in "late 2004," while she remained living in Maryland.

[3] Because we do not modify the physical-care determination, we need not reach Dawn's request to modify her child-support obligation accordingly.

would be in the child's best interest to grant the parent sole custody, include sole decision-making power" (citing *In re Marriage of Leyda*, 355 N.W.2d 862, 865 (Iowa 1984))).

**C. Attorney Fees.**

Dawn asks that we award her appellate attorney fees. Iowa Code section 598.36 (2017) provides that the court "may award attorney fees to the prevailing party in an amount deemed reasonable by the court." *See In re Marriage of Dawson*, 467 N.W.2d 271, 176 (Iowa 1991) (applying the code section in a request for appellate attorney fees). Because Dawn has not prevailed, she is not entitled to attorney fees.

**IV. Conclusion.**

As the district court is bound to reach custody determinations based upon the best interests of the child at issue, we cannot say the court abused its discretion when it denied Dawn's application for default judgment. In considering the merits of the application for modification, we find Dawn established a substantial change in circumstances exists, but we cannot say she is better able to minister to A.C.'s well-being. Thus, we affirm the district court's denial of her application for modification.

**AFFIRMED.**